IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Richard L. O'Neil, | ) | No. CV 11-2170-PHX-ROS (DKD) |
| Petitioner, | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| Charles L. Ryan, et al., | ) | |
| Respondents. | ) | |

TO THE HONORABLE ROSLYN O. SILVER, CHIEF U.S. DISTRICT JUDGE:

Richard L. O'Neil filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. 2254 on November 4, 2011, challenging his convictions in Pinal County Superior Court for fraudulent schemes and artificies, theft and forgery, and the trial court's imposition of concurrent prison terms, the longest being 15.75 years. In his habeas petition, he raises four grounds for habeas relief. He contends that trial counsel was ineffective in failing to conduct a sufficient pre-trial investigation and for deficient performance during trial. He also contends that the evidence was insufficient to convict him, and that he is actually innocent of all charges because he did not have the requisite intent. Respondents contend that O'Neil's petition is untimely, and that his claims are unexhausted and procedurally exhausted. The Court concludes that the petition is untimely, that O'Neil is not entitled to any statutory or equitable tolling, and recommends that the petition be denied and dismissed with prejudice.

**BACKGROUND**

The facts surrounding the offenses are stated in the court of appeals memorandum decision:

> On July 29, 2004, a teller at a bank in Casa Grande brought O'Neil to the desk of Donna V., because O'Neil apparently sought a loan to buy a house. When O'Neil told her his name was "Richard L. O'Neil, Jr.," Donna asked O'Neil if he had been in Tucson the day before trying to locate his account, and he responded that he had. The previous day Donna had received a telephone call from a teller at a Tucson branch trying to locate an account for "Richard O'Neil," but Donna had not been able to find the account. While speaking with O'Neil, Donna noticed he had a document containing several pages in his hands. Taking it from him to inspect, she determined it showed a transaction history for a checking account that belonged to O'Neil's uncle "Rick" and brother "Jimmy." Donna did not give the document back to O'Neil, and it was later admitted at trial. The account-holder's name listed on the document was "Richard P. O'Neil," the name of O'Neil's uncle.
>
> After Donna reviewed the document, O'Neil told her he was "supposed to be on the account" so he could assist Jimmy in paying bills. Upon looking up the account electronically, Donna told O'Neil his name was not on it. She informed him that, to add him to the account, all three "signers" – his brother Jimmy, his uncle Rick, and his father James – would have to come into the bank. During their interaction, O'Neil never referred to the possible existence of a second bank account. After O'Neil left the bank, Donna called Rick and asked if O'Neil was supposed to be on the account with Jimmy, to which Rick replied, "No. Hell[,] no," and came immediately to the bank. Donna also discovered that, before her interaction with O'Neil, the teller had given him $600 from the account.
>
> The bank's custodian of records, Michelle Johnston, testified "Richard O'Neil" had made three cash withdrawals from this account in the last weeks of July 2004. On July 23, he withdrew $550; three days later, he withdrew $1,900; and finally, on July 29, he withdrew $600. The number of a state identification card issued to "Richard Learned O'Neil" is written on all three withdrawal slips. Johnston also testified she could distinguish the letter "L" in the middle of the signature on each slip.
>
> O'Neil's brother Jimmy testified that O'Neil came and spoke to him at work and asked him to "get things straightened out" with the bank. When Jimmy replied that he would have to call Rick, O'Neil got "an intimidating look on his face and ...just took off." Jimmy did not see O'Neil after that day. Rick, who is a certified public accountant, testified he had been helping Jimmy with "financial guidance" since Jimmy began living on his own at age nineteen. He testified Jimmy has "congenital brain damage," which causes him to read at a kindergarten level and renders him unable to work with numbers above thirty. Thus, Jimmy, his father, and his uncle Rick had opened the account in 1991 so Rick could deposit Jimmy's paychecks and monitor his spending. Rick stated that Jimmy had been "duped a couple of times" into buying things for more than they were worth.

>O'Neil called Rick several days after Rick had learned of the withdrawals. O'Neil admitted the bank had wrongfully given him money from Jimmy's account but blamed it on the bank's error. Then O'Neil stated he had an account at the same bank into which he regularly deposited money. When Rick suggested the two go to the bank the next day and fix the mistake by simply transferring money from O'Neil's account back into Jimmy's, O'Neil responded that there was actually no money in his account. O'Neil told Rick he thought his father had put money into an account for him. When Rick pressed him further, O'Neil stated his father had not given him permission to withdraw any money but had been planning to give it to him and, in any event, he believed he would inherit the money eventually. Finally, when Rick told O'Neil he had informed the police about the withdrawals, O'Neil "became very upset" and threatened his uncle before hanging up the telephone.
>
>On cross-examination, Rick testified about a conversation with O'Neil's father, in which James stated he had opened a joint account with O'Neil at one time, but "then he had [O'Neil]'s name taken off of that account." Rick believed James had done so "fairly recently," but did not know exactly when. When James and O'Neil had gone into the bank to have O'Neil's name removed, the bank had erroneously "called up" Jimmy's account first, thus alerting O'Neil to the existence of Jimmy's account.
>
>At the noon recess on the first day of trial, O'Neil's counsel alerted the court that she had received "a faxed copy of a bank statement" that morning from O'Neil's father. She moved to admit the document as proof of an account in James's and O'Neil's names, but the court denied her motion. She also moved the court to allow James to testify telephonically or for a recess so James could testify in person about the existence of that account. The court also denied these motions, admonishing her for not subpoenaing all potential witnesses. But the court allowed her to mark the exhibit so that, if O'Neil testified, defense counsel could use it, if necessary, to refresh O'Neil's recollection about the account.
>
>After the close of the state's evidence, O'Neil moved for a judgment of acquittal pursuant to Rule 20, Ariz. R. Crim. P., arguing the state had not proven he had intended to take money out of Jimmy's account. The court denied the motion. On the second day of trial, in O'Neil's absence, the jury convicted him of all charges.

(Doc. 11, Exh A at 3-6).

In O'Neil's appeal, consolidated with his petition for post-conviction relief, the court of appeals affirmed the convictions and sentences, and denied his post-conviction petition (*Id.*). On June 30, 2008, the Arizona Supreme Court denied review (Doc. 11, Exh N). O'Neil did not seek review of that decision in the United States Supreme Court (Doc. 1 at 3). On May 3, 2010, O'Neil filed a second notice of post-conviction relief (Doc. 11, Exh O). In the July 24, 2010 memorandum in support of his second post-conviction petition, he

1 argued that his uncle's desire that he be sentenced to a short prison term constituted newly
2 discovered evidence that would have impacted his sentence (*Id.*, Exh P). On October 27,
3 2010, the trial court denied relief, ruling that O'Neil had failed to identify an exception to the
4 rule requiring him to raise all grounds for relief in the first post-conviction petition (*Id.*, Exh
5 Q at 2). The trial court also determined that O'Neil's evidence was not newly discovered
6 because it had been known and discussed at the sentencing hearing. The trial court also
7 noted that O'Neil's uncle's wishes for a reduced term had been considered by the trial court,
8 and adopted as a mitigating factor, resulting in the imposition of a presumptive rather than
9 aggravated term (*Id.* at 2-3). O'Neil did not seek review of the trial court's October 27, 2010
10 decision (Doc. 1 at 5). O'Neil filed his federal petition on November 4, 2011.

## DISCUSSION

12 O'Neil was required to file his federal petition within one year of the "date on which
13 the judgment became final by the conclusion of direct review or the expiration of the time
14 for seeking such review." 28 U.S.C. § 2244(d)(1)(A); *Jimenez v. Quarterman*, 129 S.Ct.
15 681, 685 (2009). O'Neil's conviction became final on September 28, 2008, following the
16 expiration of the ninety-day period in which he could have filed a petition for writ of
17 certiorari from the United State Supreme Court for review of the Arizona Supreme Court's
18 order denying review. *See Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999). He was
19 required to file his petition by September 28, 2009. Absent any statutory or equitable tolling,
20 his petition, filed two years after the expiration of the limitations period, is untimely.

21 O'Neil has not established any grounds for statutory tolling. He filed nothing in state
22 court for almost two years. O'Neil's post-conviction petition filed in 2010 did not toll the
23 limitations period. "[A] properly and timely filed petition in state court only tolls the time
24 remaining in the federal limitation period." *See Jiminez v. Rice*, 276 F.3d 478, 482 (9th Cir.
25 2001). There can be no tolling following the expiration of the limitations period because
26 "there is no period remaining to be tolled." *Webster v. Moore*, 199 F.3d 1256, 1259 (11th Cir.

- 4 -

1  2000). In addition, his 2010 post-conviction petition does not revive the expired limitations
2  period. *See Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003).

3      O'Neil has not demonstrated that he is entitled to equitable tolling. He has not
4  established that he had been "pursuing his rights diligently," and that "some extraordinary
5  circumstance stood in his way." *Holland v. Florida*, 560 U.S. ___, 130 S.Ct. 2549, 2562
6  (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418-19 and n. 8 (2005)). The Ninth
7  Circuit has recognized an actual innocence exception to the limitations bar. *Lee v. Lampert*,
8  653 F.3d 929, 933 (9th Cir. 2011). To the extent that O'Neil is claiming actual innocence
9  because he lacked the requisite intent, the Court finds the claim is without merit and does not
10 justify equitable tolling. With the same evidence he now proffers, he made the identical
11 argument in state court: before the trial court as part of a Motion for Judgment of Acquittal,
12 before the jury during closing arguments, and before the court of appeals. In each instance,
13 the claim was rejected as without merit. Under such circumstances, such evidence cannot
14 constitute sufficient evidence of actual innocence to avoid the limitations bar.

15     **IT IS THEREFORE RECOMMENDED** that Richard L. O'Neil's Petition for Writ
16 of Habeas Corpus be denied and dismissed with prejudice (Doc. 1).

17     **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave
18 to proceed *in forma pauperis* on appeal be **denied** because dismissal of the Petition is
19 justified by a plain procedural bar and jurists of reason would not find the ruling debatable.

20     This recommendation is not an order that is immediately appealable to the Ninth
21 Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of
22 Appellate Procedure, should not be filed until entry of the district court's judgment. The
23 parties shall have fourteen days from the date of service of a copy of this recommendation
24 within which to file specific written objections with the Court. *See*, 28 U.S.C. § 636(b)(1);
25 Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen
26 days within which to file a response to the objections. Failure timely to file objections to the
27 Magistrate Judge's Report and Recommendation may result in the acceptance of the Report

28

and Recommendation by the district court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Rule 72, Federal Rules of Civil Procedure.

DATED this 19th day of November, 2012.

David K. Duncan
United States Magistrate Judge